## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MARK WOOD AND DENNIS PARR, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | |
| vs. | Case No. 18-2621-EFM-GEB |
| LEARJET, INC. and BOMBARDIER, INC., | |
| *Defendants.* | |

## MEMORANDUM AND ORDER

Plaintiffs Mark Wood and Dennis Parr, on behalf of themselves and all others similarly situated, brought a claim against Defendants Learjet, Inc., and Bombardier, Inc., under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  On June 9, 2021, the Court conditionally certified a collective class under the ADEA based on pattern-or-practice allegations related to Plaintiffs' terminations.  Four additional plaintiffs are in the collective class.  Defendants are now before the Court with a Motion to Decertify (Doc. 199).  Defendants assert that Plaintiffs cannot demonstrate that they are "similarly situated" within the meaning of 29 U.S.C. § 216(b). For the reasons stated in more detail below, the Court grants Defendants' motion and decertifies the class.

## I.      Factual and Procedural Background

Named Plaintiffs Mark Wood and Dennis Parr filed suit against Defendants Learjet, Inc., and Bombardier, Inc., on November 16, 2018, asserting age discrimination claims and alleging a pattern-or-practice claim of age discrimination.  Learjet is a subsidiary of Bombardier, and Learjet operates the Bombardier Flight Test Center ("BFTC") in Wichita, Kansas.  BFTC conducts flight tests for new and modified airframes.

Learjet's Wichita facility previously included separate design and development functions for the Learjet 85 ("L85") aircraft.  Learjet terminated that program in 2015 and laid off employees who worked on that program by the end of January 2015.  Learjet recalled some of the laid-off employees to work at BFTC.

The hierarchical structure within the BFTC is: Individual Contributors reporting to a Supervisor or Section Chief, reporting to a Manager, reporting to a Director, and then reporting to the Vice President, Flight Test Center.  Learjet managers evaluate salaried employees in an annual Performance Management ("PM") Process ("PMP").  When a manager or director observes performance deficiencies, they have discretion to develop a formal, written Performance Improvement Plan ("PIP") to help monitor and improve an employee's performance.  The manager or director prepares the written document, and Human Resources ("HR") reviews it.  HR staff is not involved in the annual PMP's.

Tom Bisges has been the Vice President, Flight Test Center, since coming to BFTC from the L85 program in January 2015.  Andrew Paterson has worked for Bombardier since 1997 primarily in the flight test engineering field.  From April 2015 through April 2017, Paterson was Director of Systems Engineering for BFTC.  As a Director, he advised and made decisions as to personnel matters within BFTC that affected the budget.  Prior to April 2017, he reported directly

to Vice President Bisges.   Beginning in 2017, Paterson no longer worked in BFTC, but he continued to work with Bisges.

Paterson oversaw a number of Managers, Leads, and Section Chiefs.   Named Plaintiffs Wood and Parr were within his chain of management, but the four opt-in Plaintiffs were not.   In a meeting in either late 2014 or 2015,[1] Paterson spoke to L85 employees, including Wood and Parr. In this meeting, Paterson drew an inverted triangle to represent a large number of older workers (at the top) and a small number of younger workers (at the bottom).   Paterson stated that the age balance was upside down, and they needed to reduce the age of the company.   Wood states that Bisges repeated Paterson's comment after Wood's recall to BFTC in early 2015.

Named Plaintiff Mark Wood began working for Learjet in March 2008 as an engineer.   He worked as a Principal Engineer Specialist ("PES") on the L85 program from 2009 until January 2015 when he was notified that he would be laid off as part of the L85 layoff.   Learjet recalled him on January 21, 2015, into the BFTC, and he worked in the BFTC Mechanical (Sustaining) area. Wood's 2015 PM is the only formal review he received as a BFTC employee.   Wood first reported to Supervisor Dan Chocron, who reported to Manager John Allan, who reported to Paterson. Wood's mid-year and year-end reviews were completed by Chocron.   In both reviews, Chocron noted that Wood was struggling to meet his Task Management System ("TMS") goals.

In January 2016, Daniel Menzies became Wood's supervisor, and Menzies reported to Manager Allan.   Menzies required his employees to use TMS, and he designated Wood as a focal to organize and distribute the work of the other propulsion systems engineers.   Menzies received

---

[1] Two different dates are asserted in different depositions. The evidence shows that the L85 program lay-off occurred in January 2015, however, and thus the meeting with L85 employees likely occurred in late 2014.

complaints about Wood from internal customers because projects were not being timely completed, and he removed Wood as a focal within six months.[2]  In addition, Menzies spoke with Allan about Wood's performance, and they both agreed that a PIP was appropriate.

Before the PIP was issued, Wood learned of it and met with Betty Welday from HR on June 24, 2016, and with Paterson on June 28, 2016, and stated that he would rather resign than go through the PIP process.  Wood believed that older employees would be loaded up with tasks and could not succeed.  Paterson talked Wood out of resigning, and Wood stated that he would focus on improving his performance.

On June 30, 2016, Menzies, Welday, and Allan met with Wood to review the PIP.  They continued meeting weekly throughout July.  By week four, Wood started using TMS.

On July 20, 2016, a question arose regarding thrust settings for certain engines.  Wood signed off on a thrust rating of 23,000 pounds which was below the 25,000 pounds called for in the flight test plan.  On July 27, 2016, the flight crew noticed the discrepancy and deemed the aircraft unsafe to fly.  On July 28, 2016, Allan made the decision to end Wood's PIP and terminate him for cause because of the safety violation and his ongoing performance issues.  Allan did not involve Paterson, Menzies, or Welday in his decision.  Wood was terminated on August 3, 2016, at the age of 59.

Unknown to Allan, Paterson, Menzies, or Welday, Wood had filed an internal EEO complaint with HR on July 21, 2016, alleging that they discriminated against him because of his age by removing him as focal and placing him on a PIP.  Wood reported to HR that Paterson made a statement about the need to reduce the average age of the workforce, that Welday suggested

---

[2] Paterson was not involved in this decision.

-4-

several times that he could retire or resign instead of completing his PIP, and that his supervisor stated that he was "one of those old guy shop teachers."

Named Plaintiff Dennis Parr first worked at Learjet in 1990. He worked as a Senior Design Specialist beginning in 1999, and at the time of his termination, he worked in the BFTC Avionics (Sustaining) organization. Parr's 2013 and 2014 PM reviews were completed by Section Chief James Cephus. In these reviews, Parr was instructed to work on prioritizing his workload. In 2015, Julianne Alexander became Parr's Section Chief, and she stated in the 2015 year-end review that significant improvements in time management needed to be made.

On February 15, 2016, Alexander informed Parr that she had performance concerns and placed him on a 90-day PIP. On March 15, 2016, Matthew Hart replaced Alexander as Parr's Section Chief. As of April 19, 2019, Parr was still having problems completing his tasks. Paterson made a recommendation to terminate Parr's employment. On May 11, 2016, Hart, Allan, and Paterson agreed that Parr should be terminated for poor performance. He was 62 years old when he was terminated, and he was one of the oldest members of his work group.

Opt-in Plaintiff Alan Huey first worked for Learjet in 2008 as a project manager on the L85 program. After a brief layoff, he returned to work for Learjet in March 2009 as Senior Project Coordinator in BFTC. In 2012, he accepted an assignment with Bombardier in Canada, where he worked until spring 2015.

Bombardier has a tax equalization program when its employees work internationally. Ernst & Young ("EY") calculates the amount of taxes that Bombardier agrees to pay on the employee's behalf and estimates the employee's annual tax burden. If the amount between the actual and hypothetical tax burden differs, either the employee must pay Bombardier back (if Bombardier

paid too much) or Bombardier must pay the employee the difference (if the employee paid too much).

EY prepared Huey's annual tax returns for 2012 through 2015—the years he was in Canada. EY calculated that Huey cumulatively owed Bombardier $88,818.20. Huey claims that there must be an error in the calculations.

In 2015, Huey returned to work in Wichita and worked in the BFTC Ground Test Engineer area. On April 11, 2016, Huey offered to repay the 2012 tax payment balance and enter a payment plan for the other years. Dominque Denicourt, Senior Director of Human Resources and Knowledge Management in Montreal, negotiated with Huey on the repayment terms. On May 9, 2016, Huey rejected the company's last offer, and he did not pay the balance. Denicourt terminated Huey for insubordination because he did not pay the balance. Huey was terminated on May 26, 2016, at the age of 61 years old.

In November 2018, Defendant announced that it would be cutting 50,000 jobs worldwide because of a slow-down in business. Director Brian DuLac was primarily responsible for setting BFTC headcount needs from 2015 until May 2019. After DuLac identified the headcount numbers, he would communicate those numbers to individual directors. The individual directors ultimately decided how to identify which employees would be impacted.

Opt-in Plaintiff Patrick Bannon began working for Learjet in 1997. He was in a Technician Specialist position within the BFTC Director FTAS organization beginning in 2009 or 2010. Bannon reported to either Manager Cordell Longtine or Manager Rod Oschner. These managers reported to Director Dean Patterson.[3]

---

[3] The Court notes that there is an Andrew Paterson and a Dean Patterson.

Bannon was the only Technician Specialist, and his role was not critical because he was a "middleman." Oschner, Longtine, and Patterson worked together to make 2019 layoff decisions. They concluded that Bannon's position could be eliminated because they no longer needed a dedicated middleman, and his tasks could be absorbed by others. Bannon's performance was not a factor in the decision to eliminate his position. He was laid off on April 29, 2019, when he was 59 years old. His tasks were delegated to three other positions (aged 53, 54, and 58).

Opt-in Plaintiff David Freund began working for Learjet in 1996. He was a Senior Logistics Agent within BFTC's Flight Test Procurement organization. In 2019, Timothy Loveless, Freund's Supervisor, was told that he needed to lay off one of the four Logistics Agents. Loveless recommended Freund for layoff because he had a narrower skill set, and he was not a strong performer. Manager Andy Segraves and Patterson agreed to lay off Freund. Freund was laid off on June 21, 2019, when he was 60 years old. Freund's duties were spread across the three remaining Logistics Agents (aged 45, 53, and 60).

Opt-in Plaintiff Mark Lorg began working for the L85 program in 2013. He was laid off in the 2015 L85 layoff, but Learjet rehired him the next day. He was later transferred to a Technician, Avionics/Instrumentation Flight Test position within BFTC. Longtine and Oschner originally recommended to Patterson that 20 of the 27 Technician Avionics/Instrumentation employees should be laid off in the 2019 layoff. Ultimately, Longtine, Oschner, and Patterson laid off 11 of the 27 employees. The lay-off recommendation list ranked employees by their scores in the 2018 PM ratings. Relative performance was the primary factor. Lorg was laid off on June 21, 2019, at the age of 60. Defendant did not hire anyone to replace Lorg, and his job duties were spread across the other employees in that position (aged 29 to 63).

The non-union represented BFTC population declined from 431 to 233 employees from April 2, 2015, to June 21, 2019.  The net result of employment actions taken during that time was an increase in the workforce age from 44.76 to 46.54.  The percentage of workers above the age of 40 increased from 68% to 71%.

After named Plaintiffs Wood and Parr filed suit, they sought conditional certification of a collective class.  On June 9, 2021, this Court granted Plaintiffs' motion and certified a class of "[a]ll persons who were non-bargaining unit personnel employed in the [BFTC] in Wichita, Kansas on April 2, 2016, and whose employment thereafter ended, and were forty years of age or older at the time their employment ended."  Before the opt-in period ended, additional Plaintiffs opted-in to the collective class.  Currently, four additional opt-in Plaintiffs remain in the collective class, along with the two named Plaintiffs.  Defendants are now before the Court with a Motion to Decertify.

## II.    Legal Standard

Class actions brought under the ADEA adopt the opt-in mechanism set out in § 216(b) of the Fair Labor Standards Act ("FLSA").[4]  The FLSA permits legal action "against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."[5]  Unlike class actions pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a collective action pursuant to the mechanism set forth in § 216(b) includes only those similarly-situated individuals who opt into the class.[6]  There is no definition, however, for what it

---

[4] *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).

[5] 29 U.S.C. § 216(b).

[6] *Thiessen*, 267 F.3d at 1102.

means to be "similarly situated."[7]  Instead, the Tenth Circuit has approved an *ad hoc*, two-step approach to § 216(b) certification claims for determining whether putative opt-in plaintiffs are similarly situated to the named plaintiff.[8]

First, in the initial "notice stage," the court "determines whether a collective action should be certified for purposes of sending notice of the action to potential class members."[9]  The notice stage "requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[10]  The standard for conditional certification at the notice stage is lenient and typically results in certification for the purpose of notifying potential plaintiffs.[11]

The second step of the *ad hoc* approach occurs after discovery.[12]  "[O]ften prompted by a motion to decertify," at this stage, the district court applies a stricter standard and reviews the following factors to determine whether the opt-in plaintiffs are similarly situated: (1) the disparate factual and employment conditions of the individual plaintiffs; (2) defenses available to the defendant that are individual to each plaintiff; (3) procedural and fairness considerations; and (4)

---

[7] *Id.*

[8] *Id.* at 1102-03.

[9] *Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004) (citation omitted).

[10] *Thiessen*, 267 F.3d at 1102 (alteration and citations omitted).

[11] *See, e.g., id.* at 1103; *Koehler v. Freightquote.com, Inc.*, 93 F. Supp. 3d 1257, 1261 (D. Kan. 2015).

[12] *Thiessen*, 267 F.3d at 1102-03.

whether the plaintiffs made the filings required by the ADEA prior to initiating suit.[13]  It is within the Court's discretion whether to decertify a collection action.[14]

"Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination."[15]  "[T]he initial focus in a pattern-or-practice case is not on individual employment decisions, 'but on a pattern of discriminatory decisionmaking.'"[16]  They usually proceed in two or more stages.[17]  The first stage requires the plaintiffs "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers."[18]  This stage also requires the plaintiffs to establish that a discriminatory policy existed.[19]  The burden then shifts to the defendant to show that the plaintiff's proof is "either inaccurate or insignificant."[20]  Only in the second stage does the focus turn to whether "each individual plaintiff was a victim of the discriminatory practice."[21]

### III.    Discussion

Defendants argue that decertification is appropriate because Plaintiffs are not similarly situated.  They assert that there is no evidence of a collective-wide discriminatory pattern or practice that could tie the dissimilar claims together into one collective action.  In addition, they

---

[13] *Id*. at 1103 (citation omitted).

[14] *Id.* at 1102.

[15] *Id*. at 1106.

[16] *Id.* (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984)).

[17] *Id.*

[18] *Id.* (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360 (1977)).

[19] *Id.*

[20] *Id.* (quoting *Teamsters*, 431 U.S. at 360).

[21] *Id.*

contend that Plaintiffs' individual circumstances are vastly different, company defenses require individualized evidence, procedural and fairness considerations weigh against certification, and failure to exhaust some claims makes Plaintiffs dissimilar.

Plaintiffs highlight that they are bringing a pattern-or-practice claim. They acknowledge that it is their burden to demonstrate that a discriminatory policy existed. They contend that such a policy existed and that all six Plaintiffs are similarly situated so the Court should deny decertification.

## A.      Discriminatory Policy

Plaintiffs identify the discriminatory policy as Director Paterson's statement at a meeting in late 2014 or 2015 that the age balance was upside down.[22]  They claim that each Plaintiff's termination was related to this policy.  Yet, other than this statement, Plaintiffs have no evidence of a discriminatory policy.

In *Thiessen v. General Electric Capital Corp.*, the Tenth Circuit discussed decertification of an ADEA class action in relation to a pattern-or-practice claim.[23]  The Tenth Circuit found that the district court erred in decertifying the collective class action when the district court determined that there was not a sufficient link between the policy and the challenged employment decisions.[24] The circuit noted that "[g]iven the pattern-or-practice nature of plaintiffs' claim, this factor necessarily encompasses factual issues relevant to both the first and second stages of trial."[25]  Thus,

---

[22] As noted above, this statement likely occurred in late 2014 because Plaintiffs state that it occurred at an L85 meeting and that program ended in January 2015, but there are conflicting dates.

[23] *Thiessen*, 267 F.3d at 1106-08.

[24] *Id.* at 1106.

[25] *Id.*

the Tenth Circuit found that a jury should determine whether a sufficient link existed between the policy and the employment decisions.[26]

The facts in this case differ from the facts in *Thiessen* as to the evidence of a discriminatory policy. In *Thiessen*, the evidence showed a discriminatory policy supporting a pattern-or-practice claim. The facts showed that management referred to older executive employees as "blockers" because they were blocking the advancement of younger employees.[27] There were several memos circulated between four highly ranked management employees on how they were going to remove blockers.[28] There were leadership meetings on the concept of blockers, and managers were directed to prepare severance worksheets and retirement packages for the identified "blockers."[29] Finally, the "blocker policy" was implemented through negative employment actions toward older employees identified as "blockers."[30]

Here, the only evidence of a policy that Plaintiffs have is that one director made a statement during a meeting that the age balance was upside down, and the company needed to reduce the age of the company.[31] Unlike *Thiessen*, there is no evidence that multiple memos were circulated, that other meetings were held, that management or other people were involved in discussing the policy, or that any policy was implemented. There is no evidence that any other decisionmaker (Allan,

---

[26] *Id.*

[27] *Id.* at 1100.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Plaintiffs allege that Vice-President Bisges repeated this statement, but there is no evidence that Bisges was involved in any of Plaintiffs' terminations, or the decisions related to those terminations. Indeed, there is scant evidence relating to Bisges, other than he was Vice President and at the top of the hierarchical scheme.

Alexander, Denicourt, Longtin, Segraves, Hart, Oschner, Loveless, and Patterson) heard Paterson's statement.  There is no evidence that these decisionmakers received any direction from Paterson or any other management employee to terminate older employees.  There is no evidence that the decisionmakers made any statements related to age or referred to an upside-down age balance.  There is no evidence that there was direction to rate older employees more harshly or force them out of the company.  The so-called "policy" appears to be a stray comment uttered by Paterson.

In addition, the employment decisions at issue occurred over a span of three years and as noted above, they involved different decisionmakers.  Paterson was only involved in one termination decision in 2016, and he played no part in the other five terminations.[32]  He was not involved in the 2016 termination decisions of Wood and Huey, and he was not involved in the 2019 terminations decisions of Bannon, Freund, or Lorg.  As to the three layoffs that occurred in 2019, Paterson had not even been at BFTC for two years.  Furthermore, Defendants present evidence that the overall age of the company increased between 2015 and 2019.[33]  In sum, there is no evidence that Paterson's statement was a discriminatory policy, that any practice or procedure was put in place based on Paterson's statement, or that there was a pattern of discriminatory decision making.  Thus, the Court concludes that there is insufficient evidence of the existence of

---

[32] Paterson was only in the management stream for named Plaintiffs Wood and Parr.  The other four employees reported to a different Director than Paterson.

[33] "Gross statistical disparities . . . alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  *Raymond v. Spirit Aerosystems Holdings, Inc.*, 2023 WL 3478054, at *28 (D. Kan. 2023) (quoting *Hazelwood Sch. Dist. v. United States*, 44 U.S. 299, 307-08 (1977)).  Here, there are not gross statistical disparities, but instead the statistical evidence shows an *increase* in the age of the employees rather than a *decrease*. Even a slight decrease in the average age of the defendant's employees is statistically insignificant in showing a plan to reduce the workplace age.  S*ee Apsley v. Boeing Co.*, 691 F.3d 1184, 1204 (10th Cir. 2012).  Here, the statistical evidence further supports the lack of a discriminatory policy to reduce the average age of Defendants' workforce.

a discriminatory policy to support a pattern-or-practice claim, and Plaintiffs cannot demonstrate that they are similarly situated in this regard.

**B.      Ad Hoc Factors**

Although the Court has found that there is no identified common discriminatory policy supporting a pattern-or-practice claim, it must go on and determine whether the class should remain certified or be decertified.[34]   To determine whether Plaintiffs are similarly situated, this inquiry requires consideration of the disparate factual and employment conditions of the individual plaintiffs, the defenses available to the defendant that are individual to each plaintiff, and procedural and fairness considerations.

*1.      Factual and Employment Conditions*

As to Plaintiffs' individual employment circumstances, they differ widely.   The commonality that they share is that they all worked in the BFTC.   But Plaintiffs were employed in different positions and reported to different supervisors.   And Plaintiffs were terminated for different reasons, at different times, and by different decisionmakers.

Named Plaintiff Parr was terminated by Paterson, Hart, and Allan for poor performance while on a PIP on May 11, 2016.   Opt-in Plaintiff Huey was terminated by Denicourt for insubordination (for failing to pay back a tax balance) on May 26, 2016.   Named Plaintiff Wood was terminated by Allan for a safety violation while he was on a PIP on August 3, 2016.   Opt-in Plaintiff Bannon was laid off on April 29, 2019, by Longtine, Oschner, and Patterson because his position was eliminated.   Opt-in Plaintiff Freund was laid off on June 21, 2019, by Loveless,

---

[34] *Thiessen*, 267 F.3d at 1108 (stating that the district court must still apply the ad hoc factors even if there is evidence of a pattern-or-practice claim).   Here, the Court is presented with the opposite—no evidence of a pattern-or-practice.   Nevertheless, the Court will consider the ad hoc factors to determine if Plaintiffs are similarly situated.

Segraves, and Patterson because he was not a strong performer and had a narrower skill set than the others in his group. Finally, opt-in Plaintiff Lorg was laid off on June 21, 2019, by Longtine, Oschner, and Patterson because he was an average performer.[35] These decisions show disparate factual and employment circumstances.

Plaintiffs claim that they worked under the same management hierarchy and were subject to a common annual performance evaluation. These facts do not demonstrate such similarities for class-wide treatment. Regardless of whether Plaintiffs worked under the same management hierarchy,[36] the evidence shows that different managers made the termination decisions, and there was no centralized decision making.[37] Indeed, the facts show that Plaintiffs worked in six different areas within the BFTC.

In addition, the fact that each Plaintiff was subject to a common annual performance evaluation is insignificant. Many companies employ yearly performance reviews. And, here, the performance evaluations were not the central reason or impetus for Plaintiffs' terminations or layoffs.[38] Although Parr and Wood were placed on a PIP because of performance issues, the PIP was not entered at the time of the yearly performance review. The Court acknowledges that the performance reviews factored into the PIPs, and ultimately, Parr was terminated for failing to meet

---

[35] Bannon and Lorg were terminated by the same decisionmakers, but they were laid off for different reasons and worked in different areas of the BFTC.

[36] The commonality of the management hierarchy is that Bisges, as Vice-President, was at the top of the hierarchy. The two named Plaintiffs' Director was Paterson, Huey's Director was Denicourt, and the three other opt-in Plaintiffs' Director was Patterson.

[37] As noted above, there is no indication that these decisions were made pursuant to the same policy because there is no evidence of a policy.

[38] Plaintiffs assert that they were subject to a common annual performance evaluation process and numerical ranking system that was used in termination decisions. The evidence supports that Plaintiffs were subject to a common annual performance evaluation. However, as is discussed above, the evidence does not support that a numerical ranking system factored into each Plaintiff's termination decisions.

the PIP expectations.  Wood, however, was terminated due to a safety issue and performance issues.

Opt-in Plaintiff Huey was not terminated due to a yearly performance review but rather for insubordination because he failed to pay back a monetary balance due to Defendant.  Finally, as to the three terminations during the 2019 reduction-in-force, yearly performance reviews only played a part in two of the three terminations.  The performance reviews, however, only became a factor because Defendant implemented a reduction in force.[39]  Thus, the common annual performance reviews are not a significant enough factor to raise a common issue that makes Plaintiffs similarly situated for purposes of class certification.  In sum, the factual circumstances and employment conditions are quite different, and this factor supports decertification of the class.

### 2.    *Individualized Defenses*

Defendants additionally contend that their defenses require individualized evidence. Individualized defenses may "inhibit the efficiency of proceedings on a collective basis."[40] Defendants first assert that Bannon, Freund, and Lorg each executed a release agreement that releases ADEA claims against Defendants.  In addition, Defendants contend that Parr's and Wood's charges of discrimination may limit the scope of their claims.  Finally, Defendants state that Huey filed bankruptcy but did not disclose any claims against Defendants.  Although this evidence is not onerous, it would require individualized inquiries as to each Plaintiff.  And due to the individualized evidence relating to each Plaintiff's employment conditions, the fact that there are individualized defenses also weighs in favor of decertification.

---

[39] The factual circumstance of the lay-off procedures differ widely from Parr's and Wood's performance issues and the subsequent placement of Parr and Wood on a PIP.

[40] *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1009 (D. Kan. 2018) (citation omitted).

*3.      Fairness and Procedural Considerations*

Finally, "[f]airness and procedural considerations are important when addressing whether Plaintiffs are similarly situated."[41]  The primary purpose of a collective action is "to lower costs to the plaintiffs through the pooling of resources" and "to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."[42]  In this case, there is a lack of common representative evidence.  Instead, each Plaintiff's circumstances are highly individualized, and one proceeding would not efficiently resolve common issues of law and fact.  Indeed, the differing factual circumstances would likely confuse a jury because each set of facts presents as a mini trial.[43]

In sum, there is no evidence of a discriminatory policy to support a pattern-or-practice claim.  In addition, the disparate factual and employment circumstances, the presence of individualized defenses, and fairness and procedural considerations weigh in favor of decertification.[44]  Thus, the Court grants Defendants' motion.

---

[41] *Id.* at 1012 (quoting *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012)).

[42] *Id.* (quoting *Green*, 888 F. Supp. 2d at 1104).

[43] *Id.* (citation omitted).

[44] A fourth factor in an ADEA claim is whether the plaintiffs made the filings required by the ADEA prior to initiating suit.  *Thiessen*, 267 F.3d at 1103. The Court will not address Defendants' final argument that the opt-in Plaintiffs failed to exhaust their claims.  Defendants raise this argument simply to show that this inquiry requires an individualized assessment, and they do not present argument as to each Plaintiff instead stating that the determination of this defense is for a future motion.  Thus, the Court finds it unnecessary to specifically address this argument.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Decertify (Doc. 199) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 29th day of February, 2024.


*Eric F. Melgren*
ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE