## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK WOOD,

        *Plaintiff*,

v.

        Case No. 18-CV-2621-EFM

LEARJET, INC. and BOMBARDIER, INC.,

        *Defendants*.

## MEMORANDUM AND ORDER

Plaintiff Mark Wood brings suit against Defendants Learjet, Inc. and Bombardier, Inc. He asserts a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and a retaliation claim. This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 225). For the reasons stated below, the Court denies in part and grants in part Defendants' motion.

### I.      Factual and Procedural Background[1]

Plaintiff, age 59, worked for Defendant Learjet, Inc., a Kansas corporation. Defendant Learjet is a subsidiary of Defendant Bombardier, Inc., which is headquartered in Canada. Learjet operates a facility in Wichita, Kansas, which includes the Bombardier Flight Test Center ("BFTC"). BFTC conducts flight tests for new and modified airframes to support their eventual certification by the Federal Aviation Administration.

---

[1] The facts are those uncontroverted by the parties unless otherwise cited.

The hierarchical structure within the BFTC is: Individual Contributors reporting to a Supervisor or Section Chief, reporting to a Manager, reporting to a Director, and finally reporting to the Vice President of the Flight Test Center. There are also "leads" and "focals" that are higher up than individual contributors and below managers.

Learjet managers evaluate salaried employees in an annual Performance Management ("PM") Process ("PMP"). Human Resources Business Partners ("HRBPs"), the HR staff who support a specific business organization, are not involved in the annual PMP and do not approve employee evaluations. HR maintains the PMP ratings in a database. To start the PMP, employees meet with their direct supervisors at the beginning of the year to set annual goals. In the middle and at the end of each year, employees and their direct supervisors complete a written evaluation form and assign year-end PM ratings.

When a manager or director observes performance deficiencies, they have discretion to develop a formal, written Performance Improvement Plan ("PIP") to help monitor and improve an employee's performance. The manager or director prepares a written document setting forth the reasons and terms of the PIP. HR has a template for managers to use for PIPs, and HR reviews it to see if it makes sense. There is no documented process for managers or directors who want to hire or terminate an employee.

Learjet's Wichita facility previously included a design and development program for the Learjet 85 ("L85") aircraft, separate from the BFTC. Learjet terminated that program and laid off its employees by the end of January 2015. Plaintiff worked as a Principal Engineer Specialist ("PES") on the L85 program from 2009 until January 2015, when Learjet notified him that he was impacted by the L85 layoff and sent him home.

Dan Cochran (a supervisor/section chief) and John Allan (a manager) recommended, and Allan decided, to recall Plaintiff into a PES position within the BFTC, effective January 21, 2015. To create a position for Plaintiff within the BFTC, an existing BFTC contractor was terminated. Plaintiff was among the "upper echelon" of the engineering staff, and because of his skill and experience, he was designated as a Design Authority for propulsion systems on the C-Series aircraft that the BFTC was flight-testing in 2015 and 2016.

In 2015, Plaintiff reported to Cochran, who was replaced by Dan Menzies in 2016. Cochran and Menzies reported to Allan, who in turn reported to Andy Paterson. Paterson was the Director of Systems Engineering for the BFTC, and he in turn reported to Tom Bisges, who was Vice President of the BFTC.

In late 2014 or late 2015, Paterson conducted a meeting where he presented and discussed a diagram of the BFTC workforce, represented by a triangle with the point facing down. There was discussion by Paterson about how there were too many older people at the top and not enough younger people. In one of Paterson's presentations, he stated that Bombardier or BFTC would like to see more young people in the company's workforce. In addition, Plaintiff testified that Bisges also made a presentation in which he stated that the average age of the company was too high, and the company planned to reduce the age of the company with an age bias hiring policy.

The technical requirements of Plaintiff's PES duties in the L85 program were similar to his duties in the new PES position at BFTC, but the workflow, timing, and project oversight were different. Plaintiff's focus at L85 was design and design build, while his focus at BFTC was flight test and flight test operations. The L85 projects had longer timeframes, while the duties in BFTC were faster paced.

From 2013 to 2016, some BFTC organizations used a Task Management System ("TMS") database to track and manage employee tasks. Although TMS was available for use within the L85 program, it was used less frequently as compared to use within the BFTC. Plaintiff's annual performance objectives when he worked on the L85 did not impose any TMS objectives. Within the BFTC, Bisges did not mandate the use of TMS for all employees, and its use in a particular group was within the group leader's decision. Bisges and Paterson did not use TMS. Allan, Chocron, and Menzies required all their engineering employees to use it.

When Plaintiff worked for the L85 program in 2013 and 2014, he received overall "exceeds expectations" performance ratings from his then-supervisor Kevin Marks. When Plaintiff started at the BFTC, Cochran became Plaintiff's new supervisor. Plaintiff's mid-year and year-end reviews were completed by Chocron. Plaintiff's 2015 PMP reviews were the only formal reviews he received as a BFTC employee. After Menzies replaced Chocron as Plaintiff's supervisor in January 2016, Menzies adopted Chocron's feedback and presented it to Plaintiff in February 2016.

Several of Plaintiff's 2015 beginning-of-year objectives related to maintaining the status of deliverables in TMS. An 85% target was set. At Plaintiff's mid-year review, the PMP indicated that Plaintiff "struggled a bit more with managing his tasks." And at Plaintiff's year-end review, the PMP stated that "to address/improve [Plaintiff's] task management," a weekly meeting would be set up "to discuss priorities and status." The PMP also noted that Plaintiff's TMS was "deficient and needed regular monitoring . . . to ensure proper deliverables tracking."

In Plaintiff's 2015 PMP, his overall performance rating was a 3 (fully meets expectations). He also received an overall objective rating of 2 (partially meets expectations) and an overall competency rating of 3 (fully meets expectations). In the nine ranked tasks, he received one 4 (exceeds expectations), five 3's (fully meets expectations), and three 2's (partially meets

expectations). Other comments in Plaintiff's PMP stated that Plaintiff "effectively communicates ideas and information in the team setting," "tackles new problems with passion, bringing in coworkers only when absolutely necessary," "accepts responsibility for his own actions," and "very quickly transitioned to BFTC."

Plaintiff claims the PMP was unfair because it referenced his use of the TMS system. Plaintiff states that Chocron presented TMS to him only as a "personal tracking tool." When Menzies replaced Chocron as Plaintiff's supervisor, he asked all his employees to use TMS so he could track deliverables. Not every employee did so.

When Menzies took over Plaintiff's group in January 2016, he designated Plaintiff as a focal for the power plant team. The focal designation is an assignment of the administrative tasks of organizing and distributing work within a team. The focal is also the team's point of contact for coordinating workflow with others. Focal assignments are not processed through HR or recorded in HR's information system. Plaintiff's focal assignment was not supervisory, did not increase his pay or benefits, did not change his work hours or location, and did not change any opportunities for future advancement.

While Plaintiff was the power plant team focal, Menzies received external comments about deliverables, and Menzies felt like the work was not getting done efficiently enough and on time. By June 2016, Menzies removed Plaintiff as focal and replaced him with a co-worker, Haiden Stanger, who was 40 years old. Plaintiff testified that he was removed as a focal when they were flooded with hundreds of documents and the team was not able to respond quickly enough. Plaintiff stated that Menzies would not participate in power plant meetings and that there was not enough time in the day to do the extra work Menzies wanted performed. Members of Plaintiff's team

continued to go to Plaintiff with questions regarding propulsion systems after he was replaced as focal.

Menzies testified that Plaintiff was not meeting Menzies' expectations. Menzies met with Allan, and they agreed that a formal PIP was the appropriate next step. Plaintiff learned that he would be placed on a PIP, but before it was issued, he met with HRBP Betty Welday on June 24, 2016. In addition, Plaintiff met with Director Paterson on or before June 28, 2016. He expressed to both Welday and Paterson his intent to resign rather than go through the PIP process. Paterson talked Plaintiff out of resigning, and Plaintiff returned to Welday on June 28, 2016, to inform her that he was not resigning.

On June 30, 2016, Menzies, Welday, and Allan met with Plaintiff to review a Counsel Memo that set forth the terms of Plaintiff's PIP. With regard to the identified area of improvement "organizational skills," Plaintiff was instructed to enter his work into the TMS schedule with a goal of 85% completion. The PIP states that Plaintiff's monthly completion percentage averaged 55%, the team's monthly percentage averaged 80%, and the performance requirement for each individual on the team was 85%. Plaintiff did not believe that his monthly completion percentage rate compared to the teams' percentage rate was accurately stated in the PIP.

Menzies, Allan, and Welday held weekly PIP status meeting with Plaintiff throughout July 2016. Menzies directed Plaintiff to bring an updated list of the items he was currently working on with all fields completed to each weekly PIP status meeting. They discussed Plaintiff's current tasks and the time frames for completing them. Plaintiff did not object to the tasks. The parties dispute whether Plaintiff was complying with keeping TMS updated.[2] It is undisputed that four

---

[2] Defendants assert that Plaintiff refused to do it, and Plaintiff contends that he did it. Plaintiff submitted an affidavit in which he declares that at no time did he refuse or decline to use Defendants' TMS system as instructed by a supervisor or required during the PIP process. Defendants contend that certain parts of Plaintiff's declaration are a sham and contradict Plaintiff's previous testimony. However, Defendants cite to Plaintiff's testimony that he admitted

weeks into the PIP, Plaintiff was starting to make progress in populating TMS, and Menzies was adding more deliverables to the list.

In Plaintiff's role as Design Authority for propulsion systems on the C-Series, he was responsible for setting rated engine thrust. A Flight Preparation Sheet ("FPS) includes all instructions and all activity that takes place on an aircraft. On July 18, 2016, Stanger (the focal who had replaced Plaintiff) divided up specific FPS tasks and assigned them to either Plaintiff, Vaughn Keoshkerian, or herself. She assigned the FPS related to the engine thrust to Keoshkerian.

On July 20, 2016, some questions arose regarding the thrust setting for certain engines that had been swapped onto an aircraft that was to be flight-tested on July 27. The engine manufacturer, Pratt & Whitney, noted that the engines were "currently configured with the 23K thrust rating" and questioned whether that is what was intended to be installed. Stanger referred those questions to Plaintiff. Plaintiff asked the engine manufacturer if the thrust requirement had been resolved, and he was told that it was for BA [Bombardier] to decide. Pratt & Whitney directed Plaintiff's team to use the thrust rating (23K) that Plaintiff used in configuring the engine.

Plaintiff avers that someone else made the decision that the software for 23K thrust would be installed, that Stanger would follow up on the thrust rating issue, and that an individual from the engine manufacturer requested Plaintiff to create an FPS sequence to load a 23K thrust for the engines. In addition, Plaintiff avers that it was not his decision to install the 23K but rather it was his responsibility to approve the suitability of the thrust. Plaintiff signed an engineering document that approved a 23K thrust as suitable for the aircraft.

---

that he did not use TMS very well. It appears that the parties genuinely dispute whether he refused to use the TMS system as instructed. There are a multitude of disputes regarding TMS entries.

On July 27, 2016, during a pre-flight review, a discrepancy was noticed between the maximum thrust rating that was approved (23K) and the rating that was expected for the flight plan (25K). The flight crew refused to fly the plane until it was rated 25K. The test flight had to be cancelled pending the re-configuration of the engines.

Defendants' normal process when an error in a configuration is caught is to "write a snag" in the FPS, and then research it and fix it. Defendants have a process called a "safety line" that anyone can use if there is a safety concern, and it includes investigation by a safety committee. No investigation was done by a safety committee for the thrust configuration issue.

On July 28, 2016, after looking into the thrust issue, Allan emailed Welday stating that he wanted to "end [Plaintiff's] PIP now and proceed with termination with cause." In Allan's email, he stated that "this lack of diligence and follow through is another example why we can no longer have confidence in [Plaintiff's] abilities." Allan made the decision to terminate Plaintiff because he regarded this incident as a safety violation, which reflected Plaintiff's ongoing performance issues.

Allan did not ask Plaintiff why he set the thrust rating at 23K, nor did he inquire with Plaintiff as to the incident. Stanger was not written up for the engine thrust error incident. Menzies does not recall any engineering employee being terminated for making a configuration mistake.

Plaintiff does not believe the engine thrust rating incident was a safety violation. Allan and Plaintiff "absolutely" disagree regarding the engine thrust rating incident. Although the PIP was a 90-day plan, Defendants terminated Plaintiff before it was over.

No company policy or practice prohibited Allan from terminating Plaintiff for these reasons. Welday in HR did not have the authority to terminate employees. Instead, her role was to ensure that mangers followed company processes, and that the legal department checked

everything. Managers make the final decision to terminate. Neither Welday nor Menzies were involved in the decision to terminate Plaintiff, and they did not know of it in advance.

Plaintiff was terminated on August 3, 2016. Defendants' stated reason for terminating Plaintiff's employment was unsatisfactory performance. Allan stated Plaintiff's safety violation was another example.

Defendants did not hire a new PES to replace Plaintiff. Instead, Plaintiff's job duties were spread across ten other employees and one contractor within Plaintiff's former workgroup. Of the ten employees, four were under the age of 40, six were under the age of 50, and two were older than Plaintiff.

Prior to Plaintiff's termination, on July 23, 2016, Plaintiff filed an online EEO complaint with Bombardier's Corporate Compliance office in Montreal, Canada alleging age discrimination. Plaintiff reported to HR that Paterson made a statement about the need to reduce the average age of the workforce, Menzies made a comment that Plaintiff was "one of those old guy shop teachers," and that Welday had suggested that he could retire or resign rather than completing the PIP. The Corporate Compliance office forwarded Plaintiff's complaint to Yvonne Turner (HR Manager in Wichita) for investigation on July 25, 2016.

On July 27, Turner and HRBP Heidi Blunk interviewed Plaintiff to follow up on his complaint. At 10:36 a.m. on July 28, Turner learned by Welday's email of Allan's decision to terminate Plaintiff because of the July 27 safety incident. At that time, she had not interviewed any other witnesses, including Menzies and Allan, about Plaintiff's internal age discrimination complaint. Menzies, Allan, Paterson, and Welday did not know about Plaintiff's complaint until after Plaintiff's termination.

At the time of Plaintiff's termination, Plaintiff and one other PES reported to Menzies and Allan. The second PES was 66 years old, was not placed on a PIP, did not commit a safety violation, and was not involuntarily terminated. Three non-PES employees (Engineering Specialist, Engineer, and Senior Engineering Specialist) that reported to Allan (ages 46, 54, and 58) were issued a PIP for TMS issues. They all successfully completed their PIPs and remained employed.

Across the BFTC, Defendants employed 13 PES employees besides Plaintiff. All 13 were over age 40, 10 were over age 50, and 4 were older than Plaintiff. No other PES employee received a PIP for TMS issues.

Three other lower-level engineers (who did not report to Menzies and Allan but were in the BFTC) were placed on PIPs for TMS issues. These individuals were 36, 55, and 62. All three failed to successfully complete their PIPs. The 36-year-old accepted HR's offer to voluntarily resign instead of being terminated. The other two individuals were terminated. One of these individuals was terminated on May 5, 2016.

Dennis Parr,[3] a Senior Design Specialist in the BFTC, was also placed on a PIP for TMS performance issues in February or March 2016. Parr was terminated on May 10, 2016, and he was replaced with two younger individuals.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 30, 2017, alleging age discrimination and retaliation. The EEOC issued him a Right to Sue letter on August 21, 2018.

On November 16, 2018, Plaintiff and co-Plaintiff Dennis Parr filed suit asserting age discrimination claims and alleging a pattern-or-practice of discrimination. Plaintiff also asserted a

---

[3] Parr brought this lawsuit as a co-Plaintiff. He is no longer in the case.

retaliation claim. On June 9, 2021, the Court certified a collective class under the ADEA based on pattern-or-practice allegations related to Plaintiffs' terminations. Additional plaintiffs opted-in to the collective class.

Defendants sought decertification of the class when four opt-in plaintiffs and two named plaintiffs remained.[4] On March 1, 2024, the Court granted Defendants' motion to decertify. Defendants now seek summary judgment on Plaintiff's claims.[5]

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7] The movant bears the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[8] "Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[9] The nonmovant must then bring forth "specific facts showing a genuine issue for trial."[10] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for

---

[4] Two other opt-in Plaintiff had previously joined but were no longer in the case at this point.

[5] After decertification, named Plaintiff Parr and the four additional opt-in Plaintiffs settled with Defendants.

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[9] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp.*, 477 U.S. at 325).

[10] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)).

summary judgment.[11] The court views all evidence and draws "reasonable inferences therefrom in the light most favorable to the nonmoving party."[12]

### III.    Analysis

As an initial matter, the Court must define the claims in this case. In the Pretrial Order, Plaintiff asserts a stand-alone pattern-or-practice claim of age discrimination (referencing Count I of the Complaint),[13] a wrongful termination claim in violation of the ADEA (referencing Count I of the Complaint), and a retaliation claim (referencing Count II of the Complaint). Defendants contend, and Plaintiff concedes, that Plaintiff cannot individually bring a pattern-or-practice claim.[14] Plaintiff can, however, use pattern-or-practice evidence to support his claim for age discrimination.[15] Thus, Plaintiff does not have a pattern-or-practice claim, so his relevant claims are discriminatory termination and retaliation. Defendants seek summary judgment on both claims. The Court will address each in turn.

### A.    Age Discrimination Claim

Under the ADEA, a plaintiff must establish "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."[16] A plaintiff need not

---

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[12] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

[13] At the time the Pretrial Order was entered, the opt-in Plaintiffs and named Plaintiff Parr remained in the case.

[14] *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 633 (10th Cir. 2012) (stating that individual plaintiffs cannot bring pattern-or-practice claims) (abrogated in part on other grounds by *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 355–56 (2024)).

[15] *Id.* (noting that although a plaintiff cannot individually assert a pattern-or-practice claim, a plaintiff may introduce evidence of an alleged discriminatory policy as circumstantial evidence to support a claim of individualized discrimination); *see also DeWalt v. Meredith Corp.*, 484 F. Supp. 2d 1188, 1197 (D. Kan. 2007) (noting that a pattern-or-practice claim is inappropriate to demonstrate discrimination in an individual case, but "an individual may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework").

[16] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

demonstrate that age was the sole factor in the adverse employment action but must instead demonstrate that "age was the factor that made a difference."[17] To demonstrate age discrimination under the ADEA, a plaintiff may provide either direct evidence of discrimination or circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.[18]

    *1.*    *Direct Evidence*

Plaintiff contends that he has direct evidence of discrimination. "Direct evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status."[19] If a plaintiff presents direct evidence of discrimination, the claim "may move forward without being subjected to the [*McDonnell Douglas*] burden-shifting framework.[20] "The classic example of direct evidence of discrimination . . . [is] an explicit, mandatory age requirement."[21] "Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs."[22] In addition, "discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision."[23] Finally, "if the content and context

---

[17] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (quoting *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

[18] *Jones v. Azar*, 772 F. App'x 692, 695 (10th Cir. 2019).

[19] *Sanders v. SW. Bell Tel.*, 544 F.3d 1101, 1105 (10th Cir. 2008).

[20] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[21] *Tabor*, 703 F.3d at 1216 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

[22] *Id.*

[23] *Id.*

of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence.[24]

Here, Plaintiff contends that he has direct evidence of age discrimination because top managers in Plaintiff's direct chain of command presented a plan to reduce the average age of the workforce, and his supervisor made the statement that Plaintiff was "one of those old guy shop teachers." This evidence is not direct evidence of age discrimination because it is neither temporally related to any adverse employment action nor specifically directed to any adverse employment action. Thus, the Court does not consider it direct evidence of age discrimination and will instead evaluate these comments as circumstantial evidence.

### 2.    *Circumstantial Evidence*

If a plaintiff does not have direct evidence, a plaintiff's claim is analyzed under the familiar *McDonnell Douglas* framework.[25] Initially, the plaintiff bears the burden of establishing a prima facie case as to his claims.[26] If the plaintiff meets this burden, the defendant must come forward with a legitimate, non-discriminatory (or non-retaliatory) reason for the adverse action.[27] If the defendant does so, the plaintiff must then present evidence that the proffered reason is pretext for unlawful discrimination.[28]

### 3.    *Prima Facie Case*

To establish a prima facie case under the ADEA, a plaintiff must show (1) he was 40 or older; (2) he suffered an adverse employment action; (3) he was qualified for the employment

---

[24] *Id.*

[25] *Id.*; *see also Jones*, 617 F.3d at 1278.

[26] *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

[27] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[28] *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

position; and (4) he was treated less favorably than others not in the protected class.[29] In addition, a claim under the ADEA brings with it a "heightened evidentiary requirement" because the plaintiff must demonstrate that age "was the factor that made a difference" in the employer's decision to undertake the adverse employment action.[30] The only element of the prima facie case that the parties agree upon is that Plaintiff is over the age of 40. The Court will address the other elements in turn.

> a.    Suffered an Adverse Employment Action

Defendants and Plaintiff agree that termination was an adverse employment action. Plaintiff, however, also contends that he suffered from four other adverse employment actions. These include: (1) a downgraded yearly evaluation; (2) removal from his "focal" position; (3) placing him on a PIP; and (4) increasing his workload. Defendants argue that Plaintiff initially only pled a wrongful termination claim and to the extent he is claiming anything other than his termination as an adverse employment action, his claim fails.

As noted above, Plaintiff initially brought a pattern-or-practice claim, and these allegedly adverse employment actions were included in the context of that claim. They were not asserted as specific, discriminatory adverse employment actions. Instead, Plaintiff asserted a wrongful termination claim. Accordingly, Plaintiff cannot bring these as discrete employment actions, and the Court will instead only consider these actions in the context of Plaintiff's termination.

---

[29] *Roberts v. Winder*, 16 F.4th 1367, 1384 (10th Cir. 2021) (citing *Jones*, 617 F.3d at 1279).

[30] *Jones*, 617 F.3d at 1277–78 (citation omitted).

b.        Qualified for the Position

Under this element of a prima facie case, Plaintiff must show that he was qualified for his position.[31] This burden is "not onerous."[32] In fact, the Tenth Circuit has held that a plaintiff may "demonstrate [his] satisfactory performance simply by insisting that [he] was performing satisfactorily."[33] Furthermore, "[t]he relevant inquiry at the prima facie stage is not whether an employee . . . is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that [he] possesses the objective qualifications necessary to perform the job sought."[34]

Here, Defendants contend that Plaintiff was not satisfactorily performing his duties. In contrast, Plaintiff asserts that he was qualified for the position. The evidence shows that Plaintiff's most recent yearly performance review indicates that he primarily received favorable ratings and that he was fully meeting expectations. In addition, the evidence shows that Plaintiff had the same qualifications for the job when he obtained it as when he was let go. Thus, Plaintiff shows that he was qualified for the position.[35]

---

[31] *Id.* at 1279.

[32] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2007) (quoting *Burdine*, 450 U.S. at 253).

[33] *Brainerd v. Schlumberger Tech. Corp.*, 589 F. App'x 406, 410 (10th Cir. 2015).

[34] *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).

[35] Defendants' contention that Plaintiff was not satisfactorily performing his duties goes more toward whether Defendants' asserted reason for termination is pretextual. *See id.* at 1194.

c.        Treated Less Favorably than Others in the Protected Class

The parties articulate a slightly different fourth element for a prima facie case from each other. Defendants contend that Plaintiff must show that he was replaced with, or treated differently than, younger comparators. Plaintiff asserts that this element requires an inference of discrimination.

The Tenth Circuit uses several variations of the fourth element for a prima facie case of age discrimination. It has set forth both that the fourth element requires proof that the plaintiff was replaced by a younger person or that the fourth element requires proof that the plaintiff was treated less favorably than others.[36] Furthermore, there is some discrepancy within the Tenth Circuit as to whether the "inference of discrimination" analysis falls under the prima facie case or the pretext prong of the *McDonnell Douglas* test.[37]

Regardless of the dispute, the parties appear to agree that there must be evidence that Plaintiff was treated less favorably than others outside of the protected class. Plaintiff contends that four pieces of evidence raise an inference of discrimination that he was treated less favorably than younger workers. These include: (1) Defendants retained younger workers who replaced Plaintiff; (2) Plaintiff was treated differently than younger comparators in several instances; (3) ageist comments by three individuals; and (4) statistical evidence.

---

[36] *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1081 (10th Cir. 2023) (stating that the fourth element is replaced with a younger person); *cf. Roberts*, 16 F.4th at 1384 (stating that the fourth element is less favorable treatment).

[37] *See Luke v. Hosp. Shared Servs., Inc.*, 513 F. App'x 763, 766 (10th Cir. 2013) ("Some of our cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat these circumstances as part of the subsequent inquiry into pretext.").

Except for the statistical evidence,[38] Plaintiff presents some evidence of these facts. Plaintiff's prima facie burden is not onerous.[39] Taken together, these three pieces of evidence raise an inference of discrimination that Plaintiff was treated less favorably than younger individuals. Accordingly, Plaintiff establishes a prima facie case of age discrimination.

### 4. *Legitimate Non-Discriminatory Reason*

If a plaintiff establishes a prima facie case, it is then the defendant's burden to set forth a legitimate, non-discriminatory reason for the adverse employment decision.[40] This burden is "exceedingly light."[41] Defendants present evidence that Allan made the decision to terminate Plaintiff because Allan believed that Plaintiff made an unacceptable error when he signed off on the wrong engine thrust configuration. Allan stated that he believed it was a safety issue and occurred while Plaintiff was already on a PIP, and thus performance issues warranted Plaintiff's termination. Accordingly, Defendants establish a legitimate, non-discriminatory reason.

---

[38] Plaintiff fails to direct the Court to statistical evidence of age discrimination. "Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext." *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1197–98 (10th Cir. 2006) (quotation marks and citation omitted). "Statistical evidence that does not adjust 'for the various performance evaluations and departmental rankings of the employees included in the statistical pool' does not compare 'similarly situated' employees and therefore 'fails to eliminate nondiscriminatory explanations for disparate treatment.'" *Id.* at 1198 (citation omitted). Here, Plaintiff attempts to rely on basic data. For example, Plaintiff states that age was a factor in the employer's employment decisions and cites to a graph showing that 12 out of the 15 employees who left the BFTC in 2016 were older employees. Yet, the graph Plaintiff relies upon shows that five of the 12 employees (who were older) left the BFTC in 2016 voluntarily (as resignations). In addition, of the seven that involuntarily left, there appear to be different reasons for termination. Plaintiff does not provide the Court with other evidence to view these terminations in context—such as the individual's supervisor, individual's position, or individual's performance. Thus, Plaintiff's statistical evidence fails to support an inference of age discrimination.

[39] *Orr*, 417 F.3d at 1149.

[40] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).

[41] *Id.* (quoting *Zamora v. Elite Logistics*, 478 F.3d 1160, 1165 (10th Cir. 2007)).

5.    *Pretext*

If a defendant asserts a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual.[42] A plaintiff may show pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in a defendant's proffered reason for termination such "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[43] In assessing an employer's reason, the court must assess the facts from the employer's perspective—not the aggrieved employee's.[44] Accordingly, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[45]

A plaintiff may present evidence in a variety of ways, including:

(1) with evidence that the defendant's stated reason for the adverse employment action was false . . .; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . .; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.[46]

Plaintiff presents several arguments as to why Defendants' stated reasons were pretextual. He first claims that Defendants' proffered reasons for termination—performance issues and a safety violation—are unworthy of credence. Plaintiff contends that Defendants manipulated the

---

[42] *Id.*

[43] *Lobato v. N.M. Env't Dep't.*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[44] *Id.* (citing *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011)).

[45] *Id.* (citing *Luster*, 667 F.3d at 1094).

[46] *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

PIP documents, gave shifting reasons for his performance deficiencies/termination, and did not comply with their procedure which allowed him 90 days to complete the PIP. Plaintiff further contends that there were procedural irregularities and shortcomings in the investigation of the safety violation/thrust configuration, which raises a genuine dispute of fact as to Allan's stated reason for Plaintiff's termination.

The Court concludes that there are disputed issues of fact precluding summary judgment. First, the parties dispute Plaintiff's TMS performance issues. Plaintiff contends that he was performing the work while Defendants contend that he was not. It appears undisputed, however, that four weeks into the 90-day PIP, Plaintiff was starting to make progress in populating TMS, and his direct supervisor was adding more deliverables to his list. Thus, there are disputed issues as to Plaintiff's performance and whether it was improving and/or whether Plaintiff was complying with the PIP.

Furthermore, it is undisputed that Defendants terminated Plaintiff's employment prior to him completing the PIP. And although a different issue arose prior to the end of the PIP—the thrust configuration/safety violation—the facts surrounding it are also disputed. The evidence shows that there are questions of fact as to whether certain safety investigation protocols were followed and whether Defendants followed their procedures in investigating the incident. In addition, Plaintiff and Defendants absolutely disagree as to whether it was a safety issue. Furthermore, Plaintiff presents evidence that other individuals were involved in the thrust configuration issue, but nobody else was disciplined.

Finally, as noted above, Plaintiff presents some evidence of ageist comments by upper management in which they stated that they sought to reduce the age of the workforce.[47] And he presents evidence that his direct supervisor made the comment that Plaintiff was like "one of those old guy shop teachers." Both of these comments may not be related to Plaintiff's termination, and his supervisor's comment may have been benign. But these statements, along with disputes of material fact as to Defendants' stated reason for termination, raise an inference of discrimination. Thus, the Court denies Defendants' motion for summary judgment on Plaintiff's age discrimination claim.

## B.    Retaliation Claim

"Title VII forbids retaliation against an employee because [he] has 'opposed' any practice made unlawful by Title VII."[48] If there is no direct evidence of retaliation, the familiar *McDonnell Douglas* burden-shifting framework is applicable.[49] Here, there is no direct evidence, and thus the Court will evaluate Plaintiff's claim under the *McDonnell Douglas* framework.

A prima facie case of retaliation requires a plaintiff to demonstrate that "(1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action."[50] The parties agree that Plaintiff engaged in protected opposition to discrimination by filing an internal complaint of age discrimination. In addition, the parties agree that Plaintiff's termination was a materially adverse

---

[47] The Court notes, however, that Paterson (who made the comment) convinced Plaintiff to remain on the job, rather than resigning, when Plaintiff was going to be placed on a PIP.

[48] *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citing 42 U.S.C. § 2000e-3(a)).

[49] *Id.*

[50] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008).

employment action. They disagree, however, over whether a causal connection exists between the two events.

A plaintiff may establish a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[51] "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."[52] Furthermore, even if there is close temporal proximity, to establish a causal connection, the plaintiff "must show that the individual who took adverse action against [him] knew of the employee's protected activity."[53]

Here, there is very close temporal proximity as Plaintiff filed his internal complaint about age discrimination on July 23, 2016, and he was terminated on August 3, 2016. There is no evidence, however, that the decisionmaker—Allan—was aware of Plaintiff's complaint until after Plaintiff's termination. Although Plaintiff highly doubts that the two HR individuals who knew of Plaintiff's complaint (Turner and Blunk) did not mention this protected activity to Allan, Paterson, or the legal department, he does not present any evidence other than his speculation.[54] And the uncontroverted evidence shows that Allan, Menzies, Paterson, and Welday did not learn about Plaintiff's complaint until after Plaintiff's termination.[55] Thus, because Plaintiff cannot show a

---

[51] *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)).

[52] *Id.* (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

[53] *Montes*, 497 F.3d at 1176 (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)); *see also Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 735 (10th Cir. 2006) ("While, as a general rule, temporal proximity may be sufficient to establish a causal connection between the protected activity and the adverse action, we still require a plaintiff to show that the individual who took the adverse action against plaintiff also knew of the employee's protected activity.") (citation omitted).

[54] *See Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (noting that there was "no nexus between the person(s) to whom [the plaintiff] complained and the person who fired her," and "sheer speculation" was insufficient "to link the . . . termination to a . . . retaliatory motive.").

[55] The uncontroverted evidence demonstrates that Allan solely made the decision to terminate Plaintiff.

causal connection, he cannot establish a prima facie case. Furthermore, even if Plaintiff could establish a prima facie case, Defendants assert a legitimate, non-retaliatory reason for Plaintiff's termination, and Plaintiff fails to direct the Court to any evidence of pretext relating to his retaliation claim. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 225) is **DENIED IN PART** and **GRANTED IN PART**.

**IT IS SO ORDERED.**

Dated this 24th day of March, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE